[Civ. No. 9641. Third Dist. Dec. 31, 1959.]

JEAN McCAUGHAN, Respondent, v. HANSEN PACIFIC LUMBER COMPANY (a Corporation), Appellant.

Hill & Hill and Clayton O. Rost for Appellant.

Hilger & Thomas and Frederick L. Hilger for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment in an action for wrongful death brought by the heirs of the deceased. The action was based upon alleged negligence of defendant-appellant Hansen Pacific Lumber Company and two of its employees while logs were being unloaded from the decedent's truck. Trial by jury resulted in a judgment against the lumber company and it appeals.

The decedent, Irving McCaughan, was an independent logging truck operator who was killed when a log fell from his truck. The truck had been loaded by the logger for whom McCaughan was hauling at a log "landing" in the woods. The logs were tied on with cables extending around the load, called wrappers or binders, the purpose of which was to keep the logs from shifting or falling off while being hauled. It was the work of the truck driver to put the binders on, to operate the truck and to take the binders off. McCaughan was an experienced log truck driver. Neither McCaughan nor the logger for whom he was hauling was an employee of Hansen Pacific, which operates a lumber mill at Fortuna. Two Hansen Pacific employees were joined in the action as defendants. One of them, Bateman, was a shovel operator whose work was to unload logs from logging trucks bringing logs to the mill. The other, Campbell, was employed by Hansen Pacific as a dump man to operate dumping machinery when logs were dumped rather than removed directly from the load by means of the shovel. Campbell sometimes assisted log truck drivers in taking binders off the loads.

Hansen Pacific used an area near the mill in which logs were

sometimes dumped into a pond, and sometimes were taken direct from the trucks and stacked in what is referred to as a "cold deck." When logs were to be dumped into the pond the method used was to drive the logging truck parallel to a stationary "brow" log at the edge of the pond. Cables were attached to the brow log, passed under the load at points some distance apart, kept separated by a spreader bar, then attached to a hook which could be hoisted by power machinery so as to tighten the cables against the side of the load away from the pond. When this had been done the binders would be removed, the trucker working from the land side. The tightened cables prevented the logs from falling on him while the binders were being removed. When the binders were off, the cables were further tightened, the logs lifted and dumped over the brow log into the pond. A second method was used when the logs were to be stacked in a "cold deck." For this operation Hansen Pacific had a large power shovel on crawler tracks. It weighed about 80 tons. It had a heel boom and tongs for lifting logs. The tongs were approximately 6 feet high and were perpendicular to the "dipper stick" which could be extended and retracted. In unloading logs from trucks the procedure used was to have the truck back up underneath the shovel. The dipper stick would be extended and the tongs would be placed against the side of the load, the object being to prevent logs from rolling when the driver released the binders. After the binders were removed the logs were picked up from the load, one log at a time, and placed in the stack alongside the shovel and the truck.

McCaughan's truck had been loaded with 12 logs of relatively small size. They were placed five in the bottom tier, four in the middle tier, and three in the top tier. When he arrived at the scale shack, McCaughan assisted the scaler in scaling the logs. Following this he drove his truck to the log-stacking area. He drove past the shovel and up to a point alongside the stack. He was accompanied by Campbell. Bateman brought the shovel alongside the stack at a point where he testified he intended to place the logs. The truck was about 40 feet ahead of him. He testified that he expected the driver to back the truck under the shovel for the unloading operation and that he would then, if requested, have placed the tongs beside the load before the binders were loosened. McCaughan, however, did not back his truck. Campbell, who was with him, testified that McCaughan stopped the truck about where he, Campbell, thought the logs were to be put; that Mc-

Caughan then asked if the truck was in about the right spot and he told him he thought so. The two men then went back along the truck to take the binders off. It appears that the shovel operator usually selected the spot where he wanted to stack the logs from the truck, but that he had no control over where the driver took the binders off. Bateman sat in the cab of the shovel. He gave no signal or direction to McCaughan to back up to the shovel. McCaughan and Campbell proceeded to take off the binders. One of the logs fell. Campbell escaped, but McCaughan did not and was killed when the log struck him.

It was the theory of respondent that Hansen Pacific was actionably negligent in failing to maintain on its premises a safe place for drivers to work during the unloading operation and particularly when removing load binders. It is recognized in the industry that this part of the unloading operation is fraught with danger; that logs will sometimes roll off when the binders are removed. On this subject safety orders have been passed by the State Division of Industrial Safety and the court instructed the jury concerning them as follows:

"You are instructed that the Safety Orders having the effect of law and in effect at the time of the accident provided as follows: 'When dumping logs, the unloading line *shall* be attached and tightened or other positive safeguard securely placed before the bunk or binder chains are released.'

"If you find that the defendants at the time of the accident were in violation of the provision of law just read to you, and that that violation proximately resulted in the injury and death of Irving McCaughan, such violation constitutes negligence as a matter of law.

"You are instructed that the safety orders having the effect of law and in effect at the time of the accident provided further as follows: 'Crotched lines, spreader bars, and other similar devices shall be used in the unloading of logs, to prevent the logs from swinging.'

"If you find that the defendants at the time of the accident were in violation of the provision of law just read to you, and that that violation proximately resulted in the injury and death of Irving McCaughan, such violation constitutes negligence as a matter of law.

"The definition of the word 'shall' in the Safety Order just read to you, means that compliance with the said order is mandatory."

That when dumping logs into the pond, Hansen Pacific provided safety appliances adequate to meet the demands of the safety orders, was not a matter in issue. But when it decided, through its employees, to deck the logs, the question whether it provided adequate facilities for that operation was in issue. Certainly, it had no appliances which literally complied with the requirement that "when dumping logs, the unloading line shall be attached and tightened . . . before the bunk or binder chains are released." It does not so claim. It does claim however that the shovel, equipped with tongs which could be placed against the side of the load while the driver was taking off the bindings, constituted "other positive safeguards" and so did substantially comply with the safety order. It is apparent that tongs so placed would normally come in contact only with one point on the bottom log of the load nearest the side from which the binders were to be loosened. Such a device might permit one end of a log to fall to the ground if the tongs were not at least approximately at the center point of gravity of the log against which they were placed, and a log rolling from the top of the load might be but little impeded when it struck the tongs. Under the evidence, it was a question of fact for the jury as to whether the safeguards provided in the stacking area constituted "other positive safeguards securely placed before the bunk or binder chains are released" or devices similar to "crotched lines, spreader bars . . . to prevent the logs from swinging." The quoted instruction left it for the jury to determine whether or not Hansen Pacific was in violation of the safety orders and this was emphasized when, during its deliberations the jury, on returning to court, was admonished as follows:

"Well, it's a question of fact for you to determine. You heard testimony here as to methods of unloading logs. You had a brow log described at a pond, you had a method described whereby they used the shovel and you had crotched lines described to you. You heard what Hansen-Pacific had available there. You're to determine as a question of fact whether or not the facilities they had available does comply with these safety regulations. It isn't for me to try to guide you one way or the other in making that determination."

Hansen Pacific contends that the safety order instructions we have quoted were erroneous in that they make it appear that the safety orders applied only to Hansen Pacific and its employees. While we think it is clear that McCaughan was governed by the safety orders which appear to have

been intended for the benefit of all those in the logging industry engaged in the operation of unloading logs from trucks, we do not think that Hansen Pacific can properly complain, as it does, that undue emphasis was placed upon the duties of Hansen Pacific under the safety orders. It was the primary duty of Hansen Pacific to furnish requisite safety appliances for use in unloading, while McCaughan's duties were negative in that respect. He, of course, could not furnish the appliances nor was he required to do so. At most he was required by the safety orders, so far as applicable to him, to take off the binders under safety conditions furnished by the requisite equipment required of Hansen Pacific. Furthermore, no specific instruction was requested especially directing the jury's attention to the duties of McCaughan with relation to safety orders. Hansen Pacific claims that it gave the court opportunity to correctly instruct the jury in this respect by requesting BAJI Number 149 which would have told the jury that if *a party* to the action violated the safety orders a presumption arose that in so doing he was acting negligently; that the presumption was not conclusive and could be overcome by other evidence showing that under all the circumstances the conduct in question was excusable. This instruction would not have dispelled any impression the jury might have gotten that Hansen Pacific alone was bound by the safety orders, for it appears directed more to a permissible rebuttal defense by Hansen Pacific if the jury concluded it had violated the safety orders. ■ Furthermore, the instruction proceeded to state that a violation of a safety ordinance was excusable so as to overcome the presumption if the evidence would support a finding that the violation resulted from causes beyond the control of the person charged with the violation. This part of the instruction was not correct. (*Alarid* v. *Vanier*, 50 Cal.2d 617, 624 [327 P.2d 897].) ■ The court was under no duty to correct it. (*Shaw* v. *Pacific Greyhound Lines*, 50 Cal.2d 153, 158 [323 P.2d 391].)

■ It is next contended that the court erred in refusing to give an instruction that violation of a statute or safety order created a presumption of negligence which could be rebutted. The jury were required by the court to pass upon the issue of fact as to whether or not Hansen Pacific had complied with the safety orders and since Hansen Pacific alone was held liable by the jury (the employees having been exonerated) the jury must have resolved that issue against it. ·The court properly told the jury, therefore, that if they found

that it was in violation of the safety orders such violation was negligence *per se*. Unless this negligence was excused then Hansen Pacific was negligent as a matter of law and the question of proximate causation alone was left. Unless Hansen Pacific could point to evidence in the record excusing its violations it was not entitled to an instruction upon that subject. It claims to be able to do this, but, as we view the record, the claim is without merit. It argues that McCaughan did not back his truck under the shovel, that he did not request that the tongs be placed against the load, and that the company did what was reasonable under the circumstances, considering that McCaughan was in charge of driving the truck and taking off the binders. These matters do not touch the issue under discussion. Whether McCaughan used the device which was available and which the jury found not to measure up to the safety requirements or chose not to use it did not excuse the failure of Hansen Pacific to furnish a proper safety device. McCaughan had no control over the devices made available and when he was told to place his truck in position for stacking the load on the cold deck there was, according to the holding of the jury, no safety device measuring up to the safety order requirements which was then and there available for his use. Whether he was negligent in not using the shovel device or was negligent in taking off the binders without the use of any safety device is not an issue which we are now discussing. We find no evidence in the record warranting the giving of an instruction on excuse for safety order violations because we find no evidence which would sustain a finding by the jury that the violation was excused. The only instruction requested, BAJI Number 149, was not correct as to what will excuse violation. There was no proper request for instruction upon the subject of justification. In this condition of the record we find any contentions now being discussed without merit.

Appellant next contends that it was error for the court to instruct the jury concerning the safety order requirement that crotched lines, spreader bars and other similar devices should be used in unloading logs to prevent the logs from swinging. Appellant argues that this order was not applicable to the situation under which McCaughan met his death as his death was not caused by any "swinging" of logs. Says appellant: "Had this order been intended to apply to unloading of logs, under circumstances of this case, the last phrase of the safety order would have been prepared to read . . . 'to prevent the logs from rolling.'" To begin with, if this safety

order was not applicable, we would not, on this record, declare its giving to have constituted prejudicial error. The dangers to be met in unloading logs, the devices commonly used to lessen that danger with respect to a driver unbinding his load, the function of crotched lines and spreader bars and their nature were all matters gone into fully in the evidence and thoroughly explained both in evidence and argument to the jury. Under such circumstances, if the particular safety order here in question was not in fact applicable, its giving could not reasonably be declared to have been prejudicial. But we think further that the safety order was broader in its implications than would be indicated by the construction appellant seeks to put upon it. To be sure, the order speaks of preventing logs from ''swinging'' as one of the purposes to be met by the use of crotched lines, spreader bars and other similar devices in unloading logs. But these devices, had they been used, would obviously have furnished much greater safety to the driver engaged in unbinding his load than would have been afforded by the one device actually furnished, to wit, the placing of tongs against the side of the truck or the load. The order requires the use in unloading of crotched lines, spreader bars ''or other similar devices,'' that is, other devices furnishing the same measure of protection. The requirements are not solely to prevent logs from swinging, although that is one hazard which it is stated the order is intended to prevent. Furthermore, swinging logs would include rolling logs, particularly logs dropping by one end while held by single support, an action that would be prevented by the use of crotched lines, spreader bars and other similar devices. Necessarily the language of the safety order is general and we think that appellant places too narrow a construction upon it.

Appellant contends that there is a second reason why the giving of the instruction concerning crotched lines, spreader bars and other similar devices was error. It says that any failure to provide such devices was not the proximate cause of the accident. The instruction required as a predicate to liability that the jury find the violation of the safety order in question proximately resulted in the death of McCaughan. If, as we have held, it was proper to instruct on the safety ordinance the requirement of a finding of proximate cause was also proper and the instruction as a whole is not subject to the attack made upon it. There was evidence as to the purposes and the manner of use of crotched lines, spreader bars and other similar devices and it was to the general effect that such

devices, by spreading the support points, stabilized the logs during the unloading operation, a part of which operation, of course, was the unbinding of the load. According to the evidence, the purpose was not solely to prevent the swinging of logs that were being taken off the load. Some device similar in purpose and effect to crotched lines and spreader bars was required if those safeguards were not themselves adopted. The jury could infer that if some such device had been furnished, McCaughan would have used it and the log would not have rolled and killed him. We find no merit in this contention.

▉ Finally, appellant contends that the court erred in refusing to instruct the jury, as requested by it, upon certain safety orders concerning the loading of logs on trucks and the binding of the load and also certain requirements of the Vehicle Code applying to the manner of loading and securing loads on vehicles to be used to transport logs over public highways. Appellant requested the court to read to the jury section 679.1▉ of the California Vehicle Code. The section declares:

"The following are the rules governing the loading and securement of logs and poles for transportation over public highways by vehicles:

"1.   .   .   .   .   .   .   .   .   .   :   .   .

"e. Binders securing loads shall be tightened and locked prior to a vehicle entering upon a public highway and inspection shall be made en route to assure that the load is stable and that the binders are tight and locked. If the load becomes unstable, due to shifting or otherwise, the vehicle shall be driven from the main traveled portion of the public highway and shall not be again moved upon the main traveled portion of a public highway until corrective load or binder adjustments are made.

.   .   .   .   .   .   .   .   .   .   .   .   .

"8. a. Loads of logs and poles shall be loaded in pyramid fashion unless otherwise provided herein. b. Loads of logs and poles shall be solidly packed and have the weight centered over the bunks.

"9. . . . c. Loads over six (6) logs or poles in height shall have six (6) binders, at least one of which shall be a gut wrapper, equally spaced."

Appellant further requested the court to read to the jury an Industrial Safety Order providing in part as follows:

"No load shall leave landing until logs have been secured

with binders. No binders shall be released until the destination is reached, except when an inspection, as provided in 5296 (d) reveals that tightening is necessary. When retightening, no more than one (1) binder shall be released at any time.

"All logs shall be well balanced and centered so that the load is stable without binders. All other log loads shall be secured as follows: If the load is one or two logs high, two binders shall be used, one at each end; if three or four logs high, three binders; if five or six logs high, an additional binder; if over six logs high, two additional binders, one at each end, shall be used."

These requests were refused by the court.

It is apparent that the Vehicle Code section is concerned in the main with the safety of the public while loads are being hauled over public highways. Nevertheless, insofar as observance of the section will tend to lessen the danger of anyone engaged in work around the loads, the provisions were to be obeyed by McCaughan for his own sake. There was direct evidence that logs were placed on the truck at the landing in the woods and then the truck was moved for a short distance to get it away from the landing before the load was finally bound. The gut wrapper was placed before the load left the landing. It went around the two bottom tiers. After this wrapper was put on, the truck was driven to the county road and a short distance down the road. McCaughan then stopped and placed three more binders on the load. The total distance involved was about 1,300 feet. The final bindings went around the whole load, including the three logs on the top tier. The truck was then driven on public roads about 25 miles to the Hansen Pacific Lumber Company mill. There was no evidence that there was any difficulty with the load until the binders were removed. The only positive evidence of violation of the Vehicle Code provisions was McCaughan's driving a short distance on the county road before stopping and putting on the last of the binders.

Coming now to the safety orders: There was a violation of the provision that no load should leave the landing until the logs had been secured with binders. Appellant argues back from the falling of the log at the lumber yard and insists that the jury could infer from the fact that it fell that there had been other violations in the loading and the binding of the logs. We think the court ought to have given these instructions. We think also that the refusal to give them would not justify a reversal. It borders on sheer speculation to argue

that because a log fell during the unloading operation, which operation is admittedly dangerous, even when logs have been properly loaded and bound, that there must have been violations of the loading rules or that the violations shown had anything to do with the accident in the mill yard. For these reasons we do not think it probable that had these instructions been given a different result would have occurred. We think there was no miscarriage of justice in the refusal of these instructions.

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.